David W. Criswell, OSB No. 925930
criswelld@lanepowell.com
Andrew J. Geppert, OSB No. 203744
gepperta@LanePowell.com
**LANE POWELL PC**
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone:  503.778.2100
Facsimile:  503.778.2200

Attorneys for Kenneth S. Eiler, Trustee of
Estate of Fizz & Bubble, LLC

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>FIZZ & BUBBLE, LLC<br><br>Debtor. | Case No. 19-34092-pcm7 |
| KENNETH S. EILER,<br><br>Plaintiff,<br><br>v.<br><br>UNIQUE FUNDING SOLUTIONS LLC,<br><br>Defendant. | Adv No.<br><br>**COMPLAINT**<br><br>**(Avoidance and Recovery of Preferential Transfers – 11 U.S.C. §§ 547 and 550)** |

Plaintiff, Kenneth S. Eiler, in his capacity as the Trustee (the "**Trustee**") of the chapter 7 bankruptcy estate (the "**Estate**") of Fizz & Bubble, LLC (the "**Debtor**"), by and through his undersigned counsel, alleges as follows:

### SUMMARY OF RELIEF SOUGHT

1.    This is an action brought by the Trustee to avoid and recover preferential transfers of approximately $141,783.07 made by the Debtor to Unique Funding Solutions LLC ("**Unique Funding**") within the 90-day period prior to the filing of the Debtor's bankruptcy case.

PAGE 1 of 6 –    COMPLAINT

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719691.0001/8822646.2

## JURISDICTION AND AUTHORITY

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. § 1409.

3.      This adversary proceeding is filed in the chapter 7 bankruptcy case of the Debtor pending in the United States Bankruptcy Court for the District of Oregon, Case No. 19-34092-pcm7 (the "**Case**").

4.      The matter in controversy arises under Fed. R. Bankr. P. 7001, particularly subsections (1) and (2), 11 U.S.C. §§ 547 and 550.  It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), including the matters described in (A) and (F).

5.      The Trustee consents to the entry of a final order or judgment by the Court pursuant to LBR 7008-1.

## PARTIES

6.      The Trustee is the bankruptcy trustee appointed by the Court to administer the Estate for the benefit of the Debtor's creditors.

7.      Defendant Unique Funding is a limited liability company organized under the laws of the State of New York, with a principal place of business at 71 South Central Avenue, 2nd Floor, Valley Stream, NY 11580.

## INTRODUCTORY ALLEGATIONS

8.      The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on November 4, 2019 (the "**Petition Date**"), thereby commencing Case No. 19-34092-tmb11 before this Court.  On February 1, 2021, the Debtor's Case was converted to a case under chapter 7 of the Bankruptcy Code, and is now administered under Case No. 19-34092-pcm7.

9.      Unique Funding provided a financing solution to the Debtor using a cash advance structure whereby on August 12, 2019, Unique Funding "purchased" $674,550 of the Debtor's future receipts for $450,000.00 (the "**Purchase Price**") pursuant to a Future Receivables Sale and Purchase Agreement (the "**Financing Agreement**").  A true and correct copy of the Financing Agreement is attached hereto as Exhibit 1.  Based on the Debtor's records, the Debtor's

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

relationship with Unique Funding began on January 7, 2019. The Financing Agreement also provided for a $22,500 origination fee, which was deducted from the Purchase Price (the "**Origination Fee**"). Approximately $279,805 of the Purchase Price was applied to prior amounts owed by the Debtor to Unique Funding, which is defined as the "**Prior Balance**" in the Financing Agreement.

10.    The economic substance of the Financing Agreement is that of a loan.

11.    On August 14, 2019 Unique Funding advanced $147,695.00 to the Debtor (which is equal to the Purchase Price *minus* the Origination Fee and the Prior Balance). The Trustee has taken into account the August 14, 2019 advance when considering any potential subsequent new value defense related to payments made by the Debtor prior to August 14, 2019.

12.    Based on the Debtor's records, the Debtor remitted funds to Unique Funding on the dates and in the amounts set forth below (the "**Transfers**"):

| 08/14/2019 | Expense | Chase Primary Operating 9939 | $ | (3,122.92) |
|---|---|---|---|---|
| 08/15/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/16/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/19/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/20/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/21/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/22/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/23/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/26/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/27/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/28/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/29/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 08/30/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/04/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/05/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/06/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/09/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/10/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/11/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719691.0001/8822646.2

| 09/12/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
|---|---|---|---|---|
| 09/13/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/16/2019 | Expense | Chase Primary Operating 9939 | $ | (5,188.85) |
| 09/17/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/18/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/19/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/20/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/23/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/24/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/25/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/26/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/27/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 09/30/2019 | Expense | Chase Primary Operating 9939 | $ | (2,594.43) |
| 10/04/2019 | Bill Payment (Check) | Bank of America Checking | $ | (750.00) |
| 10/07/2019 | Bill Payment (Check) | Bank of America Checking | $ | (750.00) |
| 10/08/2019 | Bill Payment (Check) | Bank of America Checking | $ | (750.00) |
| 10/09/2019 | Bill Payment (Check) | Bank of America Checking | $ | (750.00) |
| 10/10/2019 | Bill Payment (Check) | Bank of America Checking | $ | (750.00) |
| 10/11/2019 | Bill Payment (Check) | Bank of America Checking | $ | (750.00) |
| **Total:** | | | **$** | **(141,783.07)** |

13.     The Trustee has reviewed the Debtor's books and records and, on December 2, 2021, sent a letter to Unique Funding requesting that it provide to the Trustee any documents that may support an affirmative defense to the claims asserted herein. The Trustee did not receive a response. The Trustee has taken into account any known or reasonably knowable affirmative defenses to the claims asserted herein available to Unique Funding as required by 11 U.S.C. § 547(b).

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

## CLAIM FOR RELIEF

**(Avoidance and Recovery of Preferential Transfers 11 U.S.C. §§ 547 and 550)**

14.     The Trustee restates and incorporates the allegations of paragraphs 1 through 13 above.

15.     The Trustee may avoid each of the Transfers under 11 U.S.C. § 547. The Transfers transferred property of the Debtors within the 90-day period before the Petition Date and were made:

      a.     To or for the benefit of Unique Funding;

      b.     For or on account of an antecedent debt owed by the Debtor before the Transfers were made;

      c.     Made at a time when the Debtor was insolvent;

      d.     That enabled Unique Funding to receive more than it would receive if the case were a case under chapter 7 of the Bankruptcy Code, the Transfers had not been made, and such creditor received payment of such debt to the extent provided by the Bankruptcy Code.

16.     Unique Funding was the initial transferee of the Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Transfers were made.

17.     Unless otherwise determined after a trial, pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover from Unique Funding the sum of not less than $141,783.07 plus interest thereon.

WHEREFORE, the Trustee requests entry of a judgment:

A.     Declaring the Transfers to be avoidable preferential transfers under 11 U.S.C. § 547, and entry of judgment and money award in favor of the Trustee and against Unique Funding in the amount of at least $141,783.07;

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

719691.0001/8822646.2

B.      Awarding post-judgment interest at the maximum legal rate; and

C.      Awarding the Trustee such other legal and equitable relief as may be just and proper.

DATED:  January 21, 2022

LANE POWELL PC

By:   /s/ David W. Criswell
      David W. Criswell, OSB No. 925930
      Andrew J. Geppert, OSB No. 203744
      Telephone:  503.778.2100
    Attorneys for Kenneth S. Eiler, Trustee

**LANE POWELL PC**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100  FAX: 503.778.2200

719691.0001/8822646.2

# UNIQUE FUNDING SOLUTIONS LLC

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated _____08/12/2019_____ , between Unique Funding Solution LLC ("UFS") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):

**Business Legal Name:** _____FIZZ & BUBBLE, LLC_____

**D/B/A:** _____BEAU BAIN_____

**Form of Business Entity:** _Limited Liability Company_    **EIN #:** _____ █████ _____

**Physical Address:** _____27120 SW 95TH AVE STE 3280, Wilsonville, OR 97070_____

**Mailing Address:** _____27120 SW 95TH AVE STE 3280, Wilsonville, OR 97070_____

| PURCHASE PRICE: | PURCHASED AMOUNT: | SPECIFIED PERCENTAGE: | INITIAL INSTALLMENT: |
|---|---|---|---|
| $450,000.00 | $674,550.00 | 18% | $5,188.85 per day |

**FOR SELLER #1**

By: _(signature)_

Name: KIMBERLY ANN MITCHELL, OWNER

Title: Owner/Agent/Manager

Email: _Kimberly@fizzandbubble.com_

Business Phone: _503-754-1545_

**FOR SELLER # 2**

By: _____

Name: _____

Title: Owner/Agent/Manager

Email: _____

Business Phone: _____

*Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guarantee of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to UFS by the following Owner(s)/Guarantor(s) of Seller.

**OWNER/GUARANTOR #1**

By: _(signature)_

Name: KIMBERLY ANN MITCHELL, OWNER

SSN: _____ █████ _____

Phone: _____

Address: _45 NANSEN SUMMIT, LAKE OSWEGO, OR 97035_

**OWNER/GUARANTOR #2**

By: _____

Name: _____

SSN: _____

Phone: _____

Address: _____

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign the Addendum to this Agreement in the form attached hereto.

Page 1 of 21

**WHEREAS**, Seller is desirous to sell to UFS, and UFS is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, UFS and Seller hereby agree to the foregoing and as follows:

1.  **Basic Terms and Definitions**.

    **a.**    "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when UFS paid the Purchase Price to Seller.

    **b.**    "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of each and every sum from sale made by Seller of Future Receipts.

    **c.**    "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller. "Daily Receipts" shall mean the amount of Future Receipts received by Seller on a daily basis.

    **d.**    "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to UFS pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

    **e.**    "Purchase Price" shall mean the total amount that UFS agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from UFS pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs i. and j. below. The Purchase Price is set forth in the Preamble to this Agreement.

    **f.**    "Initial Installment " shall mean the fixed amount (whether daily or weekly, as set forth in the preamble) that Seller and UFS agree to be a good faith approximation of the Specified Percentage of Seller's (daily or weekly) Future Receipts. Seller and UFS further agree that the Initial Installment set forth in the Preamble to this Agreement is based upon the the information provided by Seller to UFS concerning Seller's most recent accounts receivables, including representations by the Seller to UFS regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

    **g.**    "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

    **h.**    "Applicable Fees" shall mean, collectively, all initial costs and fees that Seller agrees to pay to UFS as consideration for agreeing to enter into this Agreement and that are described in Sections 17-19 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

    **i.**    "Prior Balance" shall mean the sum of all amounts that Seller may owe to UFS and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

    **j.**    "Origination Fee" shall mean the fee that UFS charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

    **k.**    In the event "Seller" is comprised of more than one entity, then:

        **i.**    The term "Seller" shall mean, individually and collectively, all such entities; and

        **ii.**    Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting



securities, by stature, or by contract; and

      iii.    The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

      iv.    The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

      v.    The terms "Specified Percentage", "Future Receipts", "Receipts", "Initial Installment" shall mean the Specified Percentage, and the Future Receipts of each Seller individually; and

      vi.    UFS may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

    l.    In the event "Guarantor" is comprised of more than one individual, then:

      i.    The term "Guarantor" shall mean, individually and collectively, all such individuals; and

      ii.    Each Guarantor is an Affiliate of all other Guarantor(s); and

      iii.    The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

      iv.    The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

      v.    UFS may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2.**    **The Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to UFS pursuant to this Agreement are received by UFS in full.

**3.**    **Sale of Purchased Future Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto UFS all of Seller's right, title and interest in the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to UFS (hereinafter, the portion of the Future Receipts sold by Seller to UFS pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto UFS, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to UFS of collectability of the Purchased Future Receipts by UFS and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to UFS full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4.**    **Payment of Purchase Price.** In consideration of the sale by Seller to UFS of the Purchased Future Receipts pursuant to this Agreement, UFS agrees to pay to Seller the Purchase Price; the amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

**5.**    **Use of Purchase Price.** Seller hereby acknowledges that it fully understands that: (i) UFS's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to UFS in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business UFS's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the forgoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6.**    **Initial Installments of Purchased Amount** . The Purchased Amount shall be delivered by Seller to UFS in the amount of the Initial Installment on each and every Workday or Workweek (depending on whether the Initial Installment is daily or weekly) commencing on the Effective Date and ending on the Expiration Date.

**7.**    **Approved Bank Account and Credit Card Processor.** During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by UFS (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by UFS (the "Approved Processor") and (iii) deposit all credit card receipts into the

Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

**8.**     **Authorization to Debit Approved Bank Account.** Seller hereby authorizes UFS to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the Initial Installment commencing on the Effective Date until UFS receives the full Purchased Amount;

*Seller shall provide UFS with all access code(s) for the Approved Bank Account.

The Initial Installment is to be drawn via ACH payment, from the following bank account:

    i. Account Number: _____ ████ _____

    ii. Routing Number: _____ 325070760 _____

    iii. Account Name: FIZZ & BUBBLE, LLC _____

    iv. Bank Name: ____ JPMORGAN CHASE BANK, N.A. ____

      *NOTE that this authorization is to remain in full force and effect until UFS receives written notification from Seller of its termination in such time and in such manner to afford UFS a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

**9.**     **Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or UFS's banking institution directly (or to compensate UFS, in case it is charged) all fees, charges and expenses incurred by either Seller or UFS due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge for bounced or rejected ACH debit.

**10.**    **Seller's Right for Reconciliation.** Seller and UFS each acknowledges and agrees that:

    **a.**     If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by UFS (each such calendar month, a "Reconciliation Month").

    **b.**     Such reconciliation (the "Reconciliation") of the Seller's Initial Installment for a Reconciliation Month shall be performed by UFS within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by UFS from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

    **c.**     One or more Reconciliation procedures performed by UFS may reduce or increase the effective Initial Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which UFS will be debiting the Approved Bank Account may get shortened or extended indefinitely.

**11.**    **Request for Reconciliation Procedure.**

    **a.**     It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Installments during any Reconciliation Month by sending a request for Reconciliation to UFS.

    **b.**     Any such request for Reconciliation of the Seller's Initial Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements, and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by UFS via email to reconciliation@ufsfunding.com with the subject line "REQUEST FOR RECONCILIATION," within five (5) Workdays after the last day of the Reconciliation Month at issue (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by UFS).

    **c.**     UFS's receipt of Seller's request for Reconciliation after the expiration of the five (5) Workday period following the last day of the Reconciliation Month for which such Reconciliation is requested nullifies and makes

---

---

obsolete Seller's request for Reconciliation for that specific Reconciliation Month.

    **d.**    Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and UFS shall comply with each such request, provided that:

        **i.**    Each such request is made in accordance with the terms of this Section 11; and

        **ii.**    If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by UFS from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

    **e.**    Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with UFS's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by UFS in full, or (ii) modify the amount of the Initial Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

**12.**  <u>Adjustment of the Initial Installment</u> . Seller and UFS each acknowledge and agree that:

    **a.**    If at any time during the term of this Agreement Seller experiences a steady decrease in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("<u>Adjustment</u>") of the amount of the Initial Installment that Seller is obligated to deliver to UFS in in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Installment (the "<u>Adjusted Installment</u>") shall replace and supersede the amount of the Initial Installment set forth in Section 1 above.

    **b.**    The Adjustment of the Initial Installment shall be performed by UFS within five (5) workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation.

    **c.**    One or more Adjustments performed by UFS may substantially extend the term of this Agreement.

**13.**  <u>Request for Adjustment Procedure.</u>

    **a.**    It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to UFS.

    **b.**    A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account, credit card processing statements and any aging reports immediately preceding the date of UFS's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to UFS based upon which statements the amount of the Initial Installment set forth in Section 1 above (or the then current Adjusted Installment as the case may be) was determined, and shall be received by UFS by email at <u>reconciliation@ufsfunding.com</u> with the subject line "REQUEST FOR ADJUSTMENT," within five (5) Workdays after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by UFS).

    **c.**    UFS's receipt of a Seller's Adjustment Request after the expiration of the above referenced five (5) Workday period nullifies and makes obsolete such Adjustment Request.

    **d.**    Seller shall have the right to request Adjustment of the Initial Installment, or the Adjusted Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and UFS shall comply in good faith with such request, provided that:

        i. Each such request for Adjustment is made in accordance with the terms of this Section 13; and

        ii. A request for Adjustment shall not be made after the Expiration Date.

e.    Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with UFS's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by UFS in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

## 14.    Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts ("Outstanding PAFR").

a.    Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from UFS of the Purchase Price, and upon obtaining UFS's prior written consent, to accelerate delivery to UFS of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "Outstanding PAFR"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

b.    The Outstanding PAFR can only be delivered in full and not partially.

c.    Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying UFS to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

d.    UFS shall respond to Seller's request within three (3) Workdays from the date of its receipt by UFS.

e.    In its response to Seller's request, UFS shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

f.    As of the date agreed upon as between UFS and Seller, Seller shall deliver to UFS the full amount of the Outstanding PAFR (such date, the "Accelerated Delivery Date").

g.    Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to UFS of the Initial Installments prior to the delivery of the Outstanding PAFR to UFS.

h.    Upon delivery of the Outstanding PAFR to UFS in compliance with the provisions of this Section 14, Seller's obligations to UFS pursuant to this Agreement shall be deemed completed and fulfilled.

## 15.    Rights and Obligations of UFS Upon Receipt of the Outstanding PAFR. Upon receipt of the full amount of the Outstanding PAFR:

a.    UFS shall notify the Approved Bank Account and request from it to stop transferring Initial Installments to UFS's bank account.

b.    If UFS shall have received one or more Initial Installment (or Adjusted Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing UFS's request described in subparagraph (a) above or for any other reason), UFS shall immediately do one of the two following things (but not both):

i.    Return to Seller the total sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by UFS after the date of delivery of the Outstanding PAFR to UFS; or

ii.    Apply the total sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by UFS after the Accelerated Delivery Date toward Seller's outstanding financial obligations to UFS existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

A.    By way of example, if as of the Accelerated Delivery Date, Seller and UFS would be parties to a another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "Unrelated Future Agreement"), then and in such event UFS may, in its sole and absolute discretion, apply the sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by UFS after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to UFS pursuant to the Unrelated Future Agreement.

c.    Seller acknowledges and agrees that UFS shall have the right to apply the total sum of the Initial Installments (or Adjusted Installments, as the case may be) received by UFS after the Accelerated Delivery Date toward Seller's outstanding financial obligations to UFS existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, UFS granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

## 16.    Risk Sharing Acknowledgments and Arrangements.

a. Seller and UFS each hereby acknowledges and agrees that:

    i. The Purchased Future Receipts represent a portion of Seller's Future Receipts.

    ii. This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from UFS. UFS does not charge Seller and will not collect from Seller any interest on the monies used by UFS for the purchase of the Purchased Future Receipts. The period of time that it will take UFS to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after UFS's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, UFS may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

    iii. The amount of the Initial Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to UFS.

    iv. The amounts of Seller's future Receipts may increase or decrease over time.

    v. If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be determined that the actual amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Installment as of the Effective Date set for in Section 1 of this agreement, and in comparison to the amount that both Seller and UFS may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

b. **UFS's Risk Acknowledgments**. UFS agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and UFS assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give UFS a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, UFS hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "Valid Excuses"):

    i. adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

    ii. loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;

    iii. bankruptcy of Seller; and/or

    iv. natural disasters or similar occurrences beyond Seller's control.

c. **Application of Amounts Received by UFS**. UFS reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to UFS from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

d. **Not a Loan**. Seller and UFS agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by UFS is not intended to be, nor shall it be construed as, a loan from UFS to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, UFS's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to UFS in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that UFS has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by UFS shall automatically be reduced to the maximum rate permitted by applicable law and UFS shall promptly refund to Seller any interest received by UFS in excess of the maximum lawful rate.

17. **Applicable Fees**. Seller acknowledges that the Applicable Fees were agreed upon between Seller and UFS

prior to Seller entering into this Agreement, were subject to arm-length negotiation between UFS and Seller, and a list of any of the Applicable Fees is set forth in Riders to this Agreement, which is attached hereto and made a part hereof.

**18.**    **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless UFS for any and all damages and losses (including without limitation legal fees and expenses) incurred by UFS as the result of such representation being untrue, incorrect or incomplete.

**19.**    **Origination Fee.** Seller hereby agrees for UFS to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

**20.**    **No Reduction of Purchase Price.** Seller hereby: (i) agrees to pay the Applicable Fee, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes UFS to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Agreement Fees from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**21.**    Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

**a.**    **Financial Condition and Financial Information.** Seller's bank and financial statements, copies of which have been furnished to UFS, and future statements which may be furnished hereafter pursuant to this Agreement or upon UFS's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise UFS of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. UFS may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to UFS within two (2) Workdays. Seller's failure to do so, and/or cutting off UFS's online access to the Approved Bank Account, is a material breach of this Agreement.

**b.**    **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**c.**    **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

**d.**    **Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

**e.**    **Accounting Records and Tax Returns.** Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that UFS is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

**f.**    **Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

---

Page 8 of 21

---

**g.    Business Insurance**. Seller maintains and will maintain general liability and business-interruption insurance naming UFS as loss payee and additional insured in the amounts and against risks as are satisfactory to UFS and shall provide UFS proof of such insurance upon request.

**h.    Electronic Check Processing Agreement**. Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede UFS's rights under this Agreement, without UFS's prior written consent.

**i.    No Diversion of Future Receipts**. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without UFS's written permission.

**j.    Change of Name or Location**. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and UFS, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining UFS's written consent.

**k.    Prohibited Business Transactions.** Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining UFS's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**l.    No Closing of Business**. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of UFS, and (ii) providing UFS with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to UFS. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until UFS shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporary basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide UFS ten (10) business days advance notice.

**m.    No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

**n.    Estoppel Certificate**. Seller will at any time, and from time to time, upon at least one (1) day's prior notice from UFS to Seller, execute, acknowledge and deliver to UFS and/or to any other person or entity specified by UFS, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

**o.    Unencumbered Future Receipts**. Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**p.    No Stacking**. Seller shall not further encumber the Future Receipts, without first obtaining written consent of UFS.

**q.    Business Purpose**. Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**r.    No Default Under Contracts with Third Parties**. Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**s.    Right of Access**. In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants UFS the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and

checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants UFS and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller hereby agrees to provide UFS, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow UFS to interview any of those parties.

 **t.**   **Phone Recordings and Contact**. Seller agrees that any call between Seller and UFS and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with UFS, its managers, employees and agents (collectively, the "UFS Parties") and that Seller may be contacted by any of the UFS Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the UFS Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

 **u.**   **Knowledge and Experience of Decision Makers**. The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

 **v.**   **Seller's Due Diligence**. The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by UFS.

 **w.**   **Consultation with Counsel**. The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

 **x.**   **UFS's Consent.** Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining UFS's consent, such consent may be withheld, granted or conditioned at UFS's sole and absolute discretion.

 **y.**   **No Reliance on Oral Representations**. This Agreement contains the entire agreement between Seller and UFS with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by UFS or any of the UFS Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the UFS Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

## PLEDGE OF SECURITY

**22.**   **Pledge**. As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to UFS (collectively, "Pledge") and grants to UFS a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now

existing or hereafter from time to time acquired:

    **a.**    all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    **b.**    all Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23.**    <u>Termination of Pledge</u>. Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, UFS will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24.**    <u>Representations with Respect to Collateral</u>. Seller hereby represents and warrants to UFS that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC -1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

**25.**    <u>Further Assurances</u>. Upon the request of UFS, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as UFS may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

**26.**    <u>Attorney-In-Fact</u>. Seller hereby authorizes UFS at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints UFS as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in UFS's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse and collect all instruments made payable to Seller.

## EVENTS OF DEFAULT AND REMEDIES

**27.**    <u>Events of Default.</u> The occurrence of any of the following events shall constitute an "<u>Event of Default</u>" by Seller:

    **a.**    Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Installments (or Adjusted Installments, as the case may be) to UFS, and timely and in full payment to UFS of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

    **b.**    Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    **c.**    Seller shall default under any of the terms, covenants and conditions of any other agreement with UFS (if any) which is related to the instant Agreement.

    **d.**    Seller uses multiple depository accounts without obtaining prior written consent of UFS in each instance.

    **e.**    Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    **f.**    Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of UFS in each instance.

    **g.**    Seller interferes with UFS collection of Initial Installments (or Adjusted Installments, as the case may be), or if there are two (2) or more ACH transactions attempted by UFS that are rejected by Seller's bank for any reason.

h.    The Guaranty shall for any reason cease to be in full force and effect.

**28.    Default under the Agreement.** In case any Event of Default occurs and is not waived by UFS, in writing, UFS may declare Seller in default under this Agreement without notice.

**29.    Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to UFS the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to UFS, as additional damages, any reasonable expenses incurred by UFS in connection with recovering the monies due to UFS from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that UFS shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as thirty-three percent (33%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or five thousand dollars ($5,000.00), whichever is greater. The entire sum due to UFS pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 9.00% per annum (and such interest shall accrue daily).

**30.    Remedies Upon Default.** Upon Seller's default, UFS may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

a.    Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of UFS's security interest;

b.    Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

c.    Filing the affidavit of confession of judgment (the "Affidavit"), if any, executed by the Guarantor(s), individually and on Seller's behalf, jointly and severally, in connection with this Agreement in the amount of the unpaid portion of the Purchased Amount, plus the Reasonable Damages, entering judgment with the Clerk of the Court, without notice, and executing thereon **(NOTE THAT THIS CONFESSION OF JUDGMENT PROVISION CONSTITUTES A WAIVER OF IMPORTANT RIGHTS THAT SELLER AND/GUARANTOR MAY HAVE AS PARTIES IN DEFAULT UNDER THE TERMS OF THIS AGREEMENT AND/OR GUARANTY, AND ALLOWS UFS TO OBTAIN A JUDGMENT AGAINST EITHER SELLER AND/OR GUARANTOR WITHOUT NOTICE);**

d.    Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to UFS of all or any portion of the amounts received by such credit card processor on behalf of Seller.

e.    Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation UFS's rights of a secured party under the UCC.

**31.    Remedies are not Exclusive.** All rights, powers and remedies of UFS in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to UFS by law or equity.

**32.    Power of Attorney.** Seller irrevocably appoints UFS and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to UFS from any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code (" Account Debtors"), to make payment directly to UFS (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which UFS may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount.

## ADDITIONAL TERMS

**33.    Seller Deposit Agreement.** Seller shall execute an agreement with UFS that shall authorize UFS to arrange for electronic fund transfer services and/or "ACH" payments of Initial Installments (or Adjusted Installments, as

the case may be) from the Approved Bank Account. Seller shall provide UFS and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) UFS and/or it's agent to deduct the amounts of the Initial Installment (or the Adjusted Installment, as the case may be) to UFS from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to UFS by permitting UFS to withdraw the Initial Installments (or the Adjusted Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**34.**    **Financial Condition.** Seller and its Guarantor(s) authorize UFS and its agents to investigate their financial status and history, and will provide to UFS any bank or financial statements, tax returns, etc., as UFS deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. UFS Seller hereby authorizes UFS to receive from time to time updates on such information and financial status.

**35.**    **Transactional History.** Seller shall execute written authorization(s) to their bank(s) to provide UFS with Seller's banking and/or credit-card processing history.

**36.**    **Indemnification.** Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by UFS for monies owed to UFS from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by UFS.

**37.**    **No Liability.** In no event shall UFS be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

**MISCELLANEOUS**

**38.**    **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**39.**    **Assignment.** UFS may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining UFS's written consent.

**40.**    **Notices.** Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

**41.**    **Waiver Remedies.** No failure on the part of UFS to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**42.**    **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**43.**    **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to UFS in New York, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in New York. Seller and its Guarantor(s) acknowledge and agree that New York has a reasonable relationship to this transaction.

**44.    Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

**45.    Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**46.    Entire Agreement**. This Agreement embodies the entire agreement between Seller and UFS and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

**47.    JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**48.    CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**49.    ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH UFS, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND UFS SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.**

**50.    Counterparts and Facsimile Signatures**. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER # 1**

By:_____

Name:        KIMBERLY ANN MITCHELL

Title: Owner/Agent/Manager

EIN:

**FOR THE SELLER # 2**

By:_____

Name:

Title: Owner/Agent/Manager

EIN:

**AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**

By:_____

Name:        KIMBERLY ANN MITCHELL

SSN: ███████

**OWNER/GUARANTOR # 2**

By:_____

Name:

SSN:

**UNIQUE FUNDING SOLUTIONS LLC**

By:_____

Name:

Title:

Page 15 of 21

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of 08/12/2019 by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "Guarantor") for the benefit of **Unique Funding Solutions LLC** ("Buyer").

**WHEREAS:**

A.    Pursuant to that Future Receivables Sale and Purchase Agreement (the "Agreement"), dated as of 08/12/2019 , between Buyer and the Seller(s) listed below (collectively and individually, "Seller"), Buyer has purchased a portion of Future Receipts of Seller.

| SELLER # 1: | SELLER # 2: |
|---|---|
| Legal Business Name: | Legal Business Name: |
| FIZZ & BUBBLE, LLC | |
| D/B/A: | D/B/A: |
| BEAU BAIN | |

B.    Each Guarantor is an owner, officer, or manager of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

C.    Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such obligation, individually, an "Obligation" and all such obligations, collectively, the "Obligations").

**NOW, THEREFORE,** as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

   a. any amendment, modification or extension of the Agreement or any Obligation;

   b. any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

   c. any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

   d. any other guaranty now or hereafter executed by Guarantor or anyone else;

   e. any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

f. any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

g. the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

h. the failure to give Guarantor any notice whatsoever;

i. any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York without regard to principles of conflicts of law. Except as provided in Section 10 of this Guaranty, Guarantor submits to the nonexclusive jurisdiction and venue of any state or federal court sitting in New York State or otherwise having jurisdiction over this Guaranty and Guarantor, for resolution of any claim or action arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions. Guarantor acknowledges and agrees that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to Buyer in New York, and that the transaction contemplated in this Guaranty was negotiated, and is being carried out, in New York. Guarantor acknowledges and agrees that it is guaranteeing a New York agreement and transaction. Guarantor acknowledges and agrees that New York has a reasonable relationship to this transaction.

**8. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC**

POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

9. <u>CLASS ACTION WAIVER</u>. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

10. <u>ARBITRATION</u>. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY AND/OR THE TRANSACTION CONTEMPLATED BY THE AGREEMENT, EACH BUYER, SELLER AND GUARANTOR SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND/OR INTERPRETATION OF THIS GUARANTY ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL. UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

11. **Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

12. **Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

13. **Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

AGREED AND ACCEPTED:

OWNER/GUARANTOR #1

By: _____
Name: KIMBERLY ANN MITCHELL
SSN: ███████████

OWNER/GUARANTOR #2

By: _____
Name:
SSN:

UNIQUE FUNDING SOLUTIONS LLC

By: _____
Name:
Title:

## RIDER 1

**TO THE** 08/12/2019 **FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**
**("Agreement")**
**Between UNIQUE FUNDING SOLUTIONS, LLC ("UFS")**

and_____FIZZ & BUBBLE, LLC_____("Seller")

## ORIGINATION FEE

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise

indicated herein.

**3. Origination Fees**. The parties agree that the Origination Fee that Seller shall pay to UFS pursuant to Section 19 of the Agreement shall be:

$22,500.00 , or up to 10% of the Purchase Price.

**4. Authorization**. Seller hereby authorizes UFS to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 19 of the Agreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Amount**. Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchase Amount.

**Seller and UFS agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**                        **OWNER/GUARANTOR #2**

By_____                    **By:**_____

Name: KIMBERLY ANN MITCHELL                  **Name:**

**UNIQUE FUNDING SOLUTIONS  LLC**

    **By:**_____
    **Name:**
    **Title:**
    **Name:**

## RIDER 2

### TO THE 08/12/2019
### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT
### ("Agreement")

#### Between UNIQUE FUNDING SOLUTIONS, LLC ("UFS")

and _____ FIZZ & BUBBLE, LLC _____ ("Seller")

### PRIOR BALANCE

**1. Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise

indicated herein.

**3. Prior Balance.** Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE:** ___$295,427.82___

**4. Authorization.** Seller hereby authorizes UFS to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 18 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to UFS and/or the creditors listed in this Rider.

**5. No Reduction of Purchase Price.** Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

**6. Indemnification.** Seller hereby indemnifies and holds harmless UFS for any and all damages and losses (including without limitation legal fees and expenses) incurred by UFS as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and UFS agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**AGREED AND ACCEPTED**

**OWNER/GUARANTOR #1**

By: _____

Name: KIMBERLY ANN MITCHELL

**OWNER/GUARANTOR #2**

By: _____

Name:

**UNIQUE FUNDING SOLUTIONS LLC**

By: _____

Name:

Title:

Page 20 of 21

Dear Seller,

Thank you for your interest to work with UNIQUE FUNDING SOLUTIONS LLC. We look forward to working with you for as long as you need.

As part of the underwriting process, UNIQUE FUNDING SOLUTIONS LLC will require viewing access to your bank account prior to and during the Future Receivables Sale and Purchase Agreement.. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Please fill out the form below with the information necessary to access your account.
* Be sure to indicate capital or lower-case letters.

Name of bank: _Chase Bank_____

Bank portal website: _Chase.com_____

Username: _____

Password: _____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Any other information necessary to access your account: _____

_____